Case number 12-4193 in the case of Lamson and Sessions Company v. William H Peters et al. Arguments not to exceed 15 minutes per side. Mr. Kudik for the appellant, you may proceed. May it please the court, my name is David Kudik and I'm here on behalf of the Lamson and Sessions Company. I respectfully request three minutes time for rebuttal. In 2002 and 2003, YSD Inc. was a company in trouble. It had gone from having profits of $3.5 million to having losses of $4 million. It was insolvent as of June of 2002. And as of that time, the company's principals started talking about layoffs and cutbacks. And at the same time, through March of 2003, the principals of the company, Mundiger and Peters, took approximately $4 million from the company and put them into their wives' trusts. In April of 2003, YSD said it could not pay its retiree health benefits. And therefore, Lamson became liable. And Lamson then sought recovery from YSD, Mundiger and Peters, and their accountants. The court below found summary judgment against us, and we asked this court to reverse that. Let me first address the contract claims. YSD is liable to Lamson in two ways. First, YSD is liable to Lamson as Lamson under the so-called settlement agreement, the agreement that settled the Gentile and Axelson cases. In Section 7.A of that agreement, it says, YSD shall be primarily liable for the retiree health benefits. It also says that Youngstown, at that time Lamson's subsidiary, and Lamson would also be secondarily and tertiarily, if that's the word, liable for those benefits if the prior companies defaulted. Under Ohio law, and it's not disputed, the Golson case, the Politzer case, where a guarantor picks up the obligation of a debtor, the guarantor has a right of reimbursement against the debtor. The court below said we didn't show that there was a loss. Well, that's incorrect. We did show there was a loss because we showed, and it was unrebuttaled, that we paid for the retiree benefits as of April of 2003. That automatically kicks in our right to indemnity. The only argument that they make, really, is that somehow Lamson waived that argument, but a review of the briefing shows otherwise. They say that your theory of implied indemnity is not in the case. Is it pled in your complaint, implied indemnity? We pled that there was a breach of the settlement agreement, and we had recovery under the settlement agreement. Okay. They say, well, there's no express provision of indemnity in the settlement agreement, and now your theory is there's an implied theory of indemnity. How would you preserve that theory if it's not pled in the complaint? Because we were pleading a breach of the agreement and recovery under the agreement. We believed our agreement assumed that there was this implied right, which we had. You did argue that in opposition to the summary judgment motion. You did argue implied indemnity. I mean, I have a copy of the transcript. Correct. That's what we did. But you did not argue it in your brief, though, did you? Well, let's review the briefing with respect to their summary judgment motion because that's where it came up. They first argued that we had no injury under the settlement agreement. We said, yes, we did. We paid the liabilities, and by the way, we have a right of indemnity under the purchase agreement. They say, well, the purchase agreement has nothing to do with the settlement agreement, and that we had no right of recovery under the settlement agreement in terms of indemnity. They raised that argument in their reply. That was the first time they raised it. So the first time we had as an opportunity to respond to that was the oral argument, and we set that out very clearly as we showed in our brief. We also believe that YSD is liable under the purchase agreement to Lamson as the successor to Youngstown. The court below said that we hadn't shown that Lamson was the successor. But that wasn't a disputed issue. In response to our motion for summary judgment, Mundinger and Peters said that Youngstown had been absorbed into Lamson. That was on page 5 of their opposition brief. So that wasn't an issue that we had to prove. It was already admitted. Now, with respect to the purchase agreement, the purchase agreement has all kinds of provisions that say that YSD is responsible for the retiree health benefits. Section 3.3 says it's an assumed liability. There's a whole article, Article 9, which talks about YSD picking up these liabilities. And most importantly, in Section 3.1, the contract says because YSD is going to pick up these retiree health benefits, Youngstown is going to reduce the purchase price by $5.4 million. Now, the argument is, well, because the retiree health benefits were discussed in the settlement agreement, and because the settlement agreement arose in the Gentile and Axelson cases, and because the Axelson and Gentile cases are in the excluded liability provisions, that takes away any liability they have for retiree health benefits. The reason that's wrong is it butts up against another argument that Mundinger and Peters make. They say the purchase agreement is not modified by the settlement agreement. We agree. The purchase agreement specifically set out liabilities that YSD had with respect to the retiree health benefits. Those didn't go away. All the parties contemplated is that if there were some new liabilities that were going to be picked up as part of the settlement of the Gentile and Axelson cases, those liabilities would be excluded. And, in fact, that happened. In the settlement agreement, Youngstown agreed to pick up pre-1984 premiums. Those are excluded, but not the liabilities they already had. If they were right, then Lamson or, excuse me, Youngstown got nothing for its $5.4 million. Now, let me briefly discuss the tortious interference claim against the accountants. The accountants would have you ignore the fact that the district court denied Mundinger and Peters' motion for summary judgment on the fraudulent transfer claim. In doing that, the district court found there were issues of fact as to when what were the transfers, when the company was insolvent, and whether the company concealed the transfers from their auditors, their bankers, or their creditors. And that's relevant to the tortious interference claim in a couple of ways. First, with respect to the issue of timeliness. We have a disagreement as to when the statute of limitations begins to run. But even taking their theory, which is when a tortious act occurs, as opposed to when the completed tort happens, when there's interference with the contract. There were tortious acts in 2003. The Triax transaction wasn't complete, in our view, wasn't done until March of 2003. The Henderson and Covington time records show that the authorizations weren't done until March of 2003, and the shareholder certificates weren't completed until April of 2003. During that time, Holmquist, YSD's lawyer, is asking Denison, the accountant, gee, can we do this? Denison says yes. That was in March of 2003. Mundinger says, I'm going to pull the plug on the retiree benefits. That's also in March of 2003, a week after Denison knows that there was backdating going on and the Triax transaction is still incomplete. And he doesn't give it the red light at that point in time. Those are tortious acts occurring in 2003. There's also the issue with respect to causation. The court said when Holmquist asks Denison about the transaction, Holmquist is doing that on his own. But Holmquist specifically testified that if Denison had said no, stop, he would have gone back to Mundinger and Peters and told them, hey, we have to do something else. Specifically, Mundinger and Peters also argued in response to the trustee's fiduciary breach claim that they were relying on the accountant's advice. So we are entitled to inferences that had Denison given the correct advice to Holmquist, had Denison given the correct advice to Mundinger, that both of those actions would have cured the problem, would have stopped the Triax transaction and would have kept money in the company to keep Lamson out of the obligation of having to pay for the retiree benefits. And lastly, let me talk about the issue of justification. The court... Before you move on, how do you establish the intentional misconduct by the accountants as opposed to negligence or just misfeasance, malfeasance? I mean, you have to establish intent here. What evidence do you have of intent? Well, first, there are two concepts. One is with respect to intent. In terms of do you need specific intent, I think the answer to that is no. All you need is intent that they knew that their actions would be substantially certain to breach the contract. And certainly he knew that. He said he knew about the contract. Mundinger was specifically talking to him about pulling the plug and having Lamson liable for the retiree health benefits. With respect to the issue of justification, we pointed out that there were ethical violations here. We asked their expert, if you have an insolvent company that is closely held and the company then asks, can we take money out for the shareholders? Their expert said, there's a conflict. And what you should do when there's a conflict is tell the clients there is a conflict, provide independent, tell them to go get independent advice and withdraw. Dennison didn't do that. And why do we have that rule? We have that rule there because it's likely, there's a possibility at least, that the individual providing the service is going to want to curry favor with the individuals that he's working with. That duty flows to your client? Well, the duty flows to our client. First, you asked what the intent was. The intent was to give advice that would curry favor to the client. That was improper. He also was compliant in the backdating. And he also took a blinkered view as to what to look at. When he's asked, for example, in March of 2003, are we okay? He doesn't look at the finances as of 2003. He looks at the finances as of September of 2002. And lots of stuff happened between 2002 and 2003. Because he acted improperly, he acted to interfere with the contract. But, okay, just because he acts improperly doesn't mean that he intentionally interferes with the contract. And that's what you have to prove, right? Well, I have to prove two things. I have to prove that his intent was such that he knew that his conduct was going to interfere with the contract. That's number one. Not just that his conduct was improper, but that he actually had the intent. That he knew that his actions were going to interfere with the contract and that his actions were improper. Those are the two things that we have to show, among other things. Thank you. May it please the Court, I'm Rich Witkowski for Appelese, Packer Thomas, and Phil Dennison. Mr. Kudyk seems to have conceded the statute of limitation issue with respect to the 2002 behavior based on the authority cited by the court establishing that 230509D starts to run from the date of the misconduct, the date that the tortious interference would have occurred. And since 2002 is more than four years from the date the complaint was filed, which I believe was November 16, 2006, the claims relating to 2002 are barred. With respect to 2003, there's two things that happened in 2003. The first was a letter by Attorney Holmquist who represented YSD dated March 21, 2003, which requested some advice from Mr. Dennison. The first asked him to review the minutes and comment. The second was to review the impact on the distributions relating to the triax as to retained earnings under Ohio law. And the third was impact on a conditional liability. The only evidence that we have is that Mr. Dennison responded to the request by saying that under Ohio law, as of the year-end financial statements, which had just recently been completed, there was sufficient retained earnings to support a distribution. That was the extent of the inquiry to Mr. Dennison, and that was his response. The court found that there was no evidence Dennison's advice was ever communicated to Mr. Muniger or Mr. Peters by Attorney Holmquist. Holmquist testified that he was asking for his own edification, for his own documentation to document Mr. Dennison's response. There's no indication that it had any impact whatsoever. In fact, the distributions had already been made, and as Mr. Kutick pointed out, they were working on the documentation. But the documentation provided to Mr. Dennison was that the triax spinoff was in October of 2002. There's no evidence that he was aware of any attempt to backdate or misstate the date of the transaction when he was asked the advice. The court also found that there was no evidence Muniger and Peters ever requested Dennison's opinion on that particular aspect of the transaction, and there's no evidence that there was any reliance, inducement, or causation based on Mr. Dennison's limited advice. The court concluded there was no interference in the contract by that particular advice that was provided by Mr. Dennison. I think the record, the factual record and the case law is to tortious interference support the conclusion. The second piece of advice or incident that occurred was a memorandum that was issued by Mr. Muniger, one of the principal shareholders, dated March 29, 2003. Under that request, he was asking for what Mr. Muniger was seeking on behalf of YSD was really no advice with respect to the distributions. It was simply advice regarding various other issues, the settlement agreement specifically that was in place with Lamson. Mr. Dennison never responded to that inquiry and that request. So again, there was no basis for finding causation or interference caused by Mr. Dennison as a result of the memorandum from Mr. Muniger. In regards to the justification, the district court was pretty clear that the alleged interference was not improper and that to the extent it occurred, this is normal advice by a CPA who is engaged as the outside accountant to a corporation. This is typically the type of request that comes in by the company to the CPA as to whether there is sufficient retained earnings. This was not something that Mr. Dennison interjected himself into, that he proactively got involved with the relationship. He was responding to a legitimate request and he provided a legitimate response. There is no evidence that Mr. Dennison had an ulterior motive. There was no financial incentives for him to misrepresent anything or to give improper advice. He had no financial gain. There was no motivation for him to do that. And the advice was offered in the context of his role as a CPA. There is simply no evidence that Mr. Dennison's advice or lack of advice was not justified. And there is no evidence that the advice or lack of advice relating to the March 29th exchange had any impact on the transaction or on YSD's breach of the contract. If you have any questions, I would be happy to respond. Otherwise, I will rest. Thank you. May it please the Court. Richard Thomas for all of the appellees except Packer Thomas and Dennison appellees. The real targets here in this case are Mr. Mundinger and Mr. Peters. And when counsel for the appellant argued, he didn't really talk about the alter ego theory of liability because even if there were a breach of contract, he has to show, and there is no evidence of this in this case at all, that the control of the company by Mr. Mundinger and Mr. Peters was used to commit a fraud or an illegal act. Now, there is nothing even presented in this case at all for a fraud. There is no false representation or concealment of a material fact with knowledge or recklessness as to its falsehood with the intent to induce reliance. Counsel starts with 2002 and 2003. This starts, this contract, in 1988. So for 14 years, Mundinger and Peters did everything they could in this company to pay these retiree benefits. So their theory is they raided the company for their own personal gain and they took millions of dollars out of the company and put it in their pocket and thereafter the company goes bankrupt. And doesn't that satisfy the alter ego theory under Ohio law? It wouldn't satisfy the breach of contract if that were the case, Your Honor. What it would do is it would give the company a cause of action which the trustee retains in the bankruptcy. It would give the company a cause of action against these directors.  But certainly the statutes in Ohio, Revised Code 170133, provides that dividends and distributions can be paid out of surplus. The evidence in this case is that these gentlemen received the advice of their profession. Are there factual issues? I mean, this is decided on summary judgment right now. And is it a matter that there are genuine issues of material fact as to these things that the trier of fact ought to adjudicate? Not as to Lamson. Lamson has alleged in this case, in fact in paragraph 21 of its Fourth Amendment complaint, that Youngstown, which is Youngstown Steel Door, it has said that that company is, that it's a wholly owned subsidiary of Lamson. Well, the parent company is only a shareholder in a wholly owned subsidiary. The parent company can't simply come in and say, as the parent company, we can now assert rights of our subsidiary. And beyond that, Lamson would certainly, there would be no factual aspects to anything that would be a tribal issue of fact with respect to Lamson here. What Lamson bases its claims upon is this. Actually, throughout this entire matter, into the summary judgment, Lamson based it upon the purchase agreement. Well, the complaint also alleges breach of the settlement agreement, does it not, the original complaint? It references the settlement agreement, but in summary judgment. Okay, no, it has a claim of breach of the settlement agreement in the complaint. That's my understanding. And I would be, settlement agreement was in there, yes, Your Honor. However. And then at the summary disposition argument, I recognize that their brief in opposition doesn't reference the settlement agreement. But page 11 of the transcript, they do. Lamson secondarily, but importantly, has a right on its own under the settlement agreement. And then it references the Ohio Supreme Court case of mutual finance that they argue established the right, implied right of indemnity when a secondary obligor has to pay because the primary obligor does not pay. And they say there is a breach of contract, there is an implied right of indemnity in those circumstances. So I think that the, or tell me why I'm incorrect, that the issue of settlement agreement and implied indemnity is presented to the district judge prior to his ruling. It certainly, it came up afterwards. No, it's raised before the ruling. It's raised at the hearing on the motion. And I won't argue that, Your Honor. I'll address the agreements if I may. Okay. Are you going to back off from your waiver argument? I mean, in your brief, you say implied indemnity was waived by the plaintiff because they didn't raise it in their brief in opposition to summary judgment. I mean, are you backing off on the waiver argument now? I maintain that it was waived. In fact, in their motion for summary judgment, they specifically said that they should receive summary judgment on the basis that there was a breach of the purchase agreement. What we're reviewing here is the grant of summary judgment in favor of your client. Yes, Your Honor. Now, the purchase agreement. The purchase agreement, and I'll address the settlement agreement also, but the purchase agreement is between Youngstown Steel Door, which we call Youngstown, and YSD. I'm kind of with you on the purchase agreement. The settlement agreement, however, to me, establishes secondary liability for YSD in the event that the primary obligor does not fulfill their obligations. But the appellant is arguing an implied duty that flies in the face of an express contractual provision. If there's anything there, if there's an implied duty, the implied duty of YSD would be set off against the express duty of Youngstown Steel Door, of Youngstown, the wholly owned subsidiary, to pay the liabilities with respect to the Axelson and Gentile cases because they were excluded liabilities under the purchase agreement, which was never amended, and specifically provided that it could only be amended in writing and executed by each of the parties that refers to the purchase agreement. So the purchase agreement would have to be completely ignored in order to enforce the settlement agreement of the Axelson and Gentile cases, which are excluded liabilities of YSD. So if you took both agreements, you would say, well, what YSD did for 14 years was pay the Axelson and Gentile liabilities, which were excluded and were not assumed specifically by contract under the purchase agreement. I have a kind of a maybe nitpicky practical question here, which is, as I reviewed the settlement agreements, YSD said it was going to pay these benefits for 15 years. What happens after the 15 years? YSD no longer has a liability to pay them. So what are we really arguing about here? How long did they actually pay them? For over 14 years. So we're talking about less than a year's worth of Lamson stepping up to pay under the guarantee? That would essentially be based upon this contract. And the other aspect of this, Your Honor, is that the liabilities that it paid, which were Youngstown's liabilities, would be the obligation of Youngstown to pay. YSD paid them. And Youngstown would have an implied duty under this settlement agreement to reimburse YSD because of the purchase agreement and the fact that Axelson and Gentile were specifically excluded from that agreement. And what's not provided is any evidence, reference to any evidence, that there was any document that referenced this purchase agreement and referenced this specific exclusion of these liabilities and said they're excluded because of some consideration that's been passed between the two. So there would be, at the very best, for Youngstown a set-off, and specifically for Youngstown. Not Lamson. There's no evidence that Lamson is Youngstown. The only thing that Lamson has ever said in his complaint is that Youngstown is its wholly owned subsidiary. There's no evidence that Youngstown paid. And, in fact, the way that it worked was if YSD didn't pay, Youngstown was supposed to pay. If Youngstown didn't pay, Lamson was supposed to pay. YSD paid for over 14 years, and then there's no evidence that Youngstown ever paid. If there were any implied duty of indemnification, it would run from Youngstown to Lamson. And if Youngstown ever claimed against YSD, YSD would raise the purchase agreement which said these liabilities were Axelson and Gentile. We paid this. There's no evidence whatsoever in this case that this purchase agreement was amended. There's no evidence whatsoever. That's why there is no tribal issue of fact here. And there's also no evidence that these gentlemen did something that, with respect to Lamson, that misled Lamson in any way. They paid for 14 years. And there's certainly no evidence that they did anything illegal because there are statutes that specifically provide in Ohio that they can pay a dividend. Those statutes also provide they can rely upon the advice of their accountants, their lawyers, in doing so. That's what made, whether they disagree, whether Lamson, whether the appellant disagrees or not, there was a legal payment of these dividends. Whether they think they should have been paid or not is certainly not the analysis that should be performed here. The trustee is somewhat different in that the trustee represents the creditors of the estate in total and takes on the claims that the shareholders of the company would have. And under Ohio Revised Code 1701.95, the liability for any dividends that are paid that should not have been paid is to the corporation, not to a third party. Well, how about their tortious interference claim? They say that the directors, by taking the assets from YSD and in effect bankrupting them because they took all the money and put it in their pockets, therefore breached the contract of YSD and Lamson for YSD to pay the benefits. And therefore, YSD was unable to perform under that contract because they no longer had the assets which were in the directors' pockets. And therefore, that's a tortious interference with the contract for personal gain. It was intended. How do you address that argument? Well, first of all, they're the directors of the company and they are acting for the company. No, no, they're acting personally, aren't they, with billions of dollars in their own pockets? That's the allegation, Your Honor. However, if they think they're acting for the company, isn't that an issue of fact then? Don't we go to the trier effect? Not on intentional tortious interference. No, in fact, the Ohio Supreme Court has said, a tort action may lie, speaking about a tortious interference, only where the breaching party indicates by his breach a motive to interfere with the adverse party's business relations rather than an interference with business resulting as a mere consequence of such breach. Zero evidence here, zero evidence that there was any intent by these individuals, by these directors, to do anything with respect to Lamson, the appellant here, to do anything in order to induce a breach of a contract. Nothing whatsoever. Well, they would know that the company no longer has millions of dollars of assets to pay the pension benefits if they have given the money to themselves. Your Honor, Gleeson, who was the expert chosen by the appellant here, stated that if you take triax out of all of this, which is something that he put into the September 30th numbers, that this company was still balance sheet solvent as of September 30th, 2002, after just about all of this money, all of it had been distributed. This is painting so much with a broad brush, it's a roller. And under Ohio law, the only thing you'd be looking at is the amount over which, over the surplus. That's the only amount you'd ever be looking at. They're trying to reverse everything. They're painting with a broad brush. They're ignoring their own expert who said, even after June 30th, even after September 30th, after September 30th, if you take the triax transaction out, there was still almost $800,000. Well, they are complaining about the triax transaction, though. And therefore, none of this. Their own evidence, their expert's own evidence is that this company was still solvent. They're making statements such as looting the company, those types of things. These gentlemen, after 14 years of paying these obligations, would say, this company wasn't even obligated to pay. Took a dividend after money came in that was not money from operations. It was anthem. It had demutualized, and they got all this money, and they said, what can we do? So they went to their experts, as they're entitled to do, and that's what they did. They put it in their own pockets rather than put it in the corporation so the corporation could pay the pension. There's nothing illegal at all about. I know, but if. Okay. All right. Thank you. Rebuttal. Rebuttal. Starting with Mr. Witkowski's remarks, I certainly, and Lamson certainly, doesn't concede a statute of limitations issue with respect to the proper analysis that should be applied. We believe that the tort isn't complete until the contract is breached, and that was in April of 2003. If that's true, then anything that leads to that breach, including acts that occurred in 2002, are relevant and certainly are actionable. He also said that there was no evidence that Mr. Denison saw that the information was going to be backdated. That's wrong. Holmquist, in March of 2003, sends Denison a blank or a draft of a written consent for director action, which bears a date of October of 2003, or 2002, and he refers to, this is something that we want to do to have the Triax transaction to be completed. So, Denison knew that there was backdating going on. Going to Mr. Thomas, Mr. Thomas said that we hadn't proved that there was fraud. We don't have to prove that there was fraud. All we have to prove that there was illegal conduct, and as I indicated, the court found that there were issues of fact with respect to fraudulent transfer, and there were issues of fact with respect to all the elements with respect to the badges of fraud with respect to that. That's unlawful conduct. Also, there was backdating here. That's illegal conduct under Michigan law. So we've met the standard for that. He said, with respect to the tortious interference clause. What does Michigan law have to do with it? Well, it's an unlawful act. Triax was a Michigan corporation. Okay, Triax is a Michigan corporation, okay. So they were acting unlawfully with respect to Triax and what they did. With respect to the tortious interference claim, we cited the Miller v. Weichel manufacturing case, which I think is what you're referring to. When they are acting in their personal capacities for their personal benefit, the rule that directors can't be liable for tortious interference goes out the window. If they're acting for their personal benefit, tortious interference applies. And the last thing I'll mention is he said, our expert says there is $800,000 in excess value in September of 2002. Well, the company was losing $300,000 a month. So they were going to be out of cash by the end of the year. And our expert said that the company was insolvent not only in September of 2002, but in June of 2002. There was insolvency going on here. Denison knew it. Menderger and Peters knew it. And they knew that before the creditors came after them, they were going to take the money out. That's what this case is about, and we should have the opportunity to make our case to a trier effect. Thank you. Thank you, counsel.